RUSSELL HYDE, *Administrator of* DANA HYDE *v.* THE TOWN OF JAMAICA.

*Insufficiency of highways. Liability of towns. Want of ordinary care. Dedication.*

A bridge, which it was the duty of the defendants to maintain, having been carried away by the flood, and the defendants having neglected for an unreasonable time to rebuild it, an old fordway was repaired by the highway surveyor and several others, who were interested in having it passable while they were without a bridge. The plaintiff's intestate, with knowledge that he would be obliged to ford the stream, undertook to pass from W. to T. over the highway connected with the fordway, instead of over a highway of greater length and difficulty; and arriving at the stream, which had been and was then rapidly rising, ventured to attempt its passage by means of the fordway, and in so doing was drowned. It being found and reported by a referee that the attempt to pass the stream, under the circumstances, was not an act of ordinary prudence, unless the situation of the intestate, and the propriety and sufficiency of the motives which actuated him to desire to proceed rapidly on his journey, were taken into consideration. *It was held*, that it was such a want of care and prudence as would, if the defendants were, or would otherwise have been liable, prevent a recovery against them by the plaintiff. REDFIELD, CH. J., dissenting.

To render a town liable for the insufficiency of a road, they must have the right to enter upon the land where the road is, to make and repair it; and for this purpose, the road must have been opened in the manner provided by statute, or, in the case of a dedication, it must have been acquiesced in and adopted. BENNETT, J.

A town must accept a road dedicated to them, before they will become bound to keep it in repair, and liable, if they do not, for injuries to individuals arising therefrom. BENNETT, J.

A highway surveyor has no power to lay out new highways or, to adopt, as public highways, roads already travelled. BENNETT, J.

Municipal corporations created for the purposes of government are not, at common law, liable to private actions for injuries sustained by individuals from their neglect of duty or the official neglect of their agents. BENNETT, J.

Hyde, Admr. *v.* Jamaica.

Under our statute a town is not liable for damages sustained by an individual on account of the insufficiency and want of repair of a highway or bridge, unless such damage be *direct*, and the insufficiency or want of repair is the *proximate* cause of the injury. BENNETT, J.

If therefore a town neglects for an unreasonable time to rebuild a bridge, they will not, on that account, be liable for an injury which was not the proximate or immediate, but only the remote result of the want of a bridge. BENNETT, J.

No action is given by our statute for injuries occasioned by the neglect of towns to open roads. BENNETT, J.

A road of necessity to be distinguished from a road of convenience. BENNETT, J.

*Willard* v.*Newbury*, 22 Vt. 458, and *Batty* v.*Duxbury*, 24 Vt. 155 considered and the grounds of their decision stated by BENNETT, J.

Upon the facts found and reported by the referee in this case, (for which, see report,) the defendants are not liable on the ground that the fordway was a part of the highway; or on account of their neglect to rebuild the bridge within a reasonable time; or on account of their neglect to make and open a sufficient by-way or outlet. BENNETT, J.

Considerations involved in the determination of questions respecting ordinary care and prudence, by BENNETT, J.,—ISHAM, J., and by REDFIELD, CH. J.

ACTION ON THE CASE to recover for damages occasioned by the insufficiency and want of repair of a highway and bridge which it was the duty of the defendants to keep in repair, and by the neglect, by the defendants, of that duty. The action was referred, and the referee, at the September Term, 1852, made his report, upon which the county court, — PIERPOINT, J., presiding, — rendered a judgment for the plaintiff; to which the defendants excepted.

The report of the referee was as follows:

From the year 1831 to the present time, there has existed in the town of Jamaica, a public highway, leading from the village of North Wardsboro, in the town of Wardsboro, by the dwelling-house of George Allen and the dwelling-house of Asahel Watson, to the village of West Townshend, in the town of Townshend, — which highway, so far as it extended within the town of Jamaica, that town, on the 26th day of April, 1850, and for many years previous, and ever since have been liable to maintain and keep in repair. About one mile from North Wardsboro, in the direction of West Townshend, this highway crossed a stream of water called " the Branch," by a bridge, which was situated within the town of Jamaica, and which it was also the duty of that town to maintain and

keep in repair. At all times subsequent to the year 1833, except as hereinafter stated, a stage, transporting the mail and passengers, passed over this highway, for a year or two, daily, and afterwards tri-weekly; and the highway was in other respects an important road, although the amount of travel over it has, for the last two years, been somewhat diminished, by reason of the construction and use of the lines of railroad in this state; and from 1849 to 1851, the travel over it was also diminished by the fact, that a bridge across West River, over which, when existing, the travel usually passed to reach this highway, in going westerly from West Townshend, was gone, whereby travellers were required to make something of a circuit in order to get upon this road.

Previous to there being any bridge constructed at the point where the highway crossed "the Branch," above mentioned, and about the year 1830 or 1831, there was a fordway prepared and used for crossing "the Branch," at a point within the town of Jamaica, a short distance above the place where the bridge was subsequently erected; but there was no evidence tending to prove whether this fordway was then prepared by the town of Jamaica, through its officers and agents, or by individuals. This fordway was used until the bridge was constructed.

About the year 1837 or 1838, the bridge across "the Branch" above mentioned, fell, and was gone for some time; and the old fordway previously used as above stated, was then cleared out, and the stones removed from the bed of the stream, and the way conducting to it from the main road on each side of the stream, was put in such condition that it could be used, and all the travel upon the highway passed across "the Branch," by this by-way and ford, until the bridge was rebuilt. But there was no evidence proving by whom the by-way was then opened and repaired.

On the 15th of March, 1850, the bridge across "the Branch," at this point, again fell, by reason of the unsoundnesss of some of the timbers, and the weight of snow upon it. The stream was then frozen, and the plank and timber lay as they fell for some time, and until the water rose in the stream, in the early part of April, 1850, and carried away the greatest part of them. Previous to their being so carried away by the rise of water, the bridge might have been rebuilt at a much less expense than afterwards; but

no movement was made by the town of Jamaica or its officers or agents, towards rebuilding the bridge, until long subsequent to the 26th of April, 1850. The bridge was 90 feet in length, resting upon abutments at each end, and with a trestle in the centre, and there was nothing needed for the rebuilding of the bridge, at the time it fell, or previous to the next subsequent rise of water, but to replace the wood work, substituting new timber for such timbers of the old bridge as had become rotten and insufficient. The bridge might and should reasonably have been replaced previous to April 26th, 1850.

After the bridge had fallen in the spring of 1850, as above stated, and after the ice had gone out from the stream, in the early part of April, 1850, the old fordway above mentioned, and the way leading to it from the main road, on each side of the stream, were again repaired and made passable. It was not necessary to enter any enclosed land for this purpose ; but the ford and some portions of the way leading to it from the main road, on each side of the stream, were without the surveyed limits of the highway. From the time when the ford was first used, in 1830 or 1831, as above stated, the way leading to it was not closed although it was wholly disused while the bridge was standing. The stage which had passed over that road to North Wardsboro, until the bridge fell, passed, after the fall of the bridge, through the village of Jamaica, the effect of which was that the mail arrived at North Wardsboro late in the night. Several of the citizens of North Wardsboro therefore called upon the highway surveyor of the district in Jamaica, in which said bridge and ford were situated, and urged him to fix the fordway so as to make it passable ; and some of these offered to assist him about it if he would do so.

Accordingly, between the first and middle of April, 1850, the highway surveyor, acccompanied by his two sons, one of whom was a tax payer in the district, went to the place, and aided by some of the citizens of Wardsboro, who felt an interest in having the road passable, cleared out the old fordway, rolling the stones from it, and making it wider than it had previosly been, and repaired and made wider the road leading to the fordway, from the main road on the east side of the stream. The highway surveyor was a witness at the trial, and the defendants proposed to

inquire of him, whether in working on the by-way, as above mentioned, he acted as an officer of the town or otherwise, and his answer to this question was received, subject to objections by the plaintiff. His reply was that he did not act as an officer of the town in so doing. But I find that he was applied to, to do the work and open the by-way, as highway surveyor, and that he did assume the direction and control of doing the work in opening the by-way for the reason that he was highway surveyor, and that he did it with intent to prepare a way, by which travellers might cross the stream until the bridge should be rebuilt, and that he made no declaration at the time, and did no act, which would indicate to one acquainted with the circumstances, that he was not acting as highway surveyor, and I am not satisfied from the evidence, and therefore I do not find, that it even occurred to him at the time, or previous to the 26th day of April, 1850, that in doing the work he was acting as an individual, rather than as highway surveyor. He has never made any charge upon the rate bill for the work so done by him, nor have any of those who aided him made any claim to be paid by the town; and the citizens of Wardsboro who aided him, did not at the time ever expect to call upon the town; and the highway surveyor never received any directions from the selectmen to open the by-way, or to do any work upon it, nor did it appear that either of the selectmen had any knowledge that he was so doing, or had so done, until April 26, 1850.

After this fordway and the way leading to it on each side of the stream had thus been made passable in April, 1850, as above stated, all who had occasion to travel the highway between that time and the 26th of April, which was two weeks or thereabouts, crossed at that fordway. The stage passed there once. The highway surveyor passed there several times, with teams, and while travelling upon the road; and it was used generally by those in the immediate neighborhood who had occasion to cross the stream at that point, and by all the travellers upon the highway.

The fordway, as thus prepared and used, crossed the stream at nearly a right-angle with the current, and was straight and smooth upon the bottom; but it was narrow, and by reason of its narrowness and the proximity of large stones to that which was intended for its travelled path, I find that it was insufficient, and not reason-

ably suitable for the purpose for which it was designed; and this insufficiency contributed to the happening of the injury to the plaintiff's intestate hereinafter mentioned.

The plaintiff's intestate, Dana Hyde, was a physcian of respectable standing in the profession, residing in April, 1850, and for some years previous, at the village of West Townshend. On the 26th day of April, 1850, he was attending, as a physician, at West Townshend, upon a child that was dangerously sick of cholera morbus. He was the family physician of the parents of the child; he called to see the child twice that morning, the last time at about 10 o'clock in the forenoon, and then said to the parents, that there probably would be a change in the condition of the child, either for the better or the worse, in the course of the day, and that he was obliged to go to Wardsboro, but that he would return at 4 o'clock, or about that time, that afternoon; and he left some medicine, and directions how to treat the child until 4 o'clock. He did go to the village of North Wardsboro, which was about five miles from West Townshend, and was accompanied by his son, a lad about ten years of age. He went by what is called the Hill road, leading by the house of Abijah Pierce. As far as the house of William S. Waterman, this was the same road which he would have travelled, if he had intended to take the road up "the Branch," above mentioned; and from Waterman's, by the Hill road, to North Wardsboro, was three miles and three hundred and twelve rods, and by "the Branch" road, it was three miles and one hundred and ninety-three rods. The Hill road from Waterman's to North Wardsboro was then in very bad condition. It was very hilly, and it had been so drifted through the winter, that the travel had left the road and passed through the adjoining fields for some distance, and two days previous the fences had been replaced and the drifts in the road been shoveled out, so as to make the road passable; but the travelling over it was in every respect tedious, and uncomfortble. While at the house of Abijah Pierce, upon this road, Dr. Hyde expressed an intention to return by "the Branch" road, saying that the travelling over the road he had come was "awful," and that he had rather "wade," than return that way; and he at the same time said, he had heard the stage had passed there; and he was then informed by Mrs. Pierce that it had passed that way

but once.   After transacting his business at North Wardsboro, Dr. Hyde started between 2 and 3 o'clock in the afternoon to return home by way of " the Branch" road above mentioned.

Dr. Hyde was then driving the same horse and wagon, which he had been accustomed to use in his business for some years. The wagon body was hung upon short thorough-braces, and the bottom of the body was elevated from the ground about thirty-three or thirty-four inches; and the body was connected with the forward axle by a king-bolt, which was not keyed; and I do not find that it was usual, or customary, at that time, to have the king-bolt of such wagons keyed.   The wagon was sufficient for all ordinary use.   The horse that Dr. Hyde was driving was of less than medium size, weighing from eight to nine hundred pounds, and had been foundered in his forward feet, and was thin of flesh.   He was a safe horse to use for any ordinary business, but was not as active, or as reliable in any emergency, as he would have been, if sound.

A few minutes previous to three o'clock in the afternoon, Dr. Hyde reached the ford-way above mentioned, which was one mile below North Wardsboro, upon the stream.

It was a warm, pleasant day, and, by reason of the melting of the snow, the stream had been rising through the day, and it was then rapidly rising.   For a few rods above the ford-way, the channel of the stream was somewhat filled with large stone, and for the entire distance below, from the ford to the bridge, which by the road, on the west side, was one hundred and thirteen feet, but by the stream was somewhat further, the channel was filled to a very considerable extent, with large stones, varying from eighteen inches to three feet in diameter.   From the ford, in a distance of sixty feet towards the bridge, there was a descent in the stream, of four feet.   Above the ford the descent, in a distance of one hundred and ninety-eight feet, was two feet and eleven inches.   The ordinary depth of water at the ford was from twelve to eighteen inches; and at that time the water was nearly and perhaps quite two and a half feet deep upon the ford, and turbed, and about eighty feet across.   After reaching the ford, Dr. Hyde and his son both left the wagon and went upon the abutment of the bridge and looked at the stream.   After some five or ten minutes there spent, they returned to the wagon, and the boy took his seat in the wagon, and

30

Dr. Hyde led his horse to the margin of the water, at the ford, and then got into the wagon and drove into the stream, in the traveled path of the ford. They did not succeed in crossing the stream, but were both drowned. But they were not in sight of any person after entering the stream, and the particular manner of the accident is wholly unknown. I find that Dr. Hyde was, while at the abutment of the bridge, as above stated, in the full exercise of his mental powers. Some evidence was given on the part of the defendants, which, it was claimed, had a tendency to prove that he had been drinking spirituous liquor,—but it was wholly unsatisfactory to me, and I find the fact, in this respect, as above stated.

It was then three o'clock in the afternoon, and had Dr. Hyde succeeded in crossing the ford, he had reason to believe that he would reach West Townshend by four o'clock, which was the time he had promised to be there, as above stated. If he had not attempted to cross the ford, it would have been necessary for him to return to North Wardsboro, which was one mile, and thence go to West Townshend by the Hill road,—which he had before travelled that day,—so that the distance to be travelled, from where he then was, to West Townshend, would have been about two and one-third miles greater, if he did not cross the ford, than if he did, and over a very bad road; and if he did not cross the ford, he had reason to believe that he would not reach West Townshend until some considerable time after four o'clock, and probably not until nearly or quite six o'clock.

It is extremely difficult to determine, with any certainty, what was the precise depth and appearance of the water in the ford, at the time Dr. Hyde drove in, for the reason that none of the witnesses saw the water at that place, until an hour or more afterwards; and all agree that, during the interval, the water was rising constantly, and with great rapidity. But I am inclined to the opinion, that it is the fair result of all the evidence, and I do, therefore, find and report, that a person of ordinary prudence, merely desiring to make progress in his journey, but actuated by no particular motives for haste, and driving such a horse as was then driven by Dr. Hyde, would not have ventured to attempt to cross the stream at that time and place.

But if it is allowable, in determining the question of ordinary prudence, to take into consideration the situation and circumstances

of the individual, and the motives which influenced him to desire to proceed rapidly in his journey, and the sufficiency of those motives, then, I do find and report, that a person of ordinary prudence, situated in every respect as Dr. Hyde then was, would have attempted to cross the stream at that time and place. And I do find that the presence of his child furnished a powerful motive to Dr. Hyde to deliberate and decide with caution, and that he undoubtedly believed, at the time, that he was not doing a rash or imprudent act, in attempting to cross the stream.

Dr. Hyde left a widow, and six children—the youngest an infant, and the oldest about sixteen years of age.

If as matter of law upon these facts, the plaintiff is entitled to recover, then I find, that the defendants are guilty in manner and form as the plaintiff in his declaration hath alleged, and I therefore find for the plaintiff to recover of the defendants two thousand dollars damages and his costs. Otherwise I find that the defendants are not guilty in manner and form as the plaintiff hath alleged in his declaration, and therefore find for the defendants to recover their costs.

*Kellogg* and *Shafter* for the defendants.

I. The facts found do not show the place of the accident a public highway, either by legislative authority, or by dedication, 2 Smith's Lea. Ca. 176—80, and cases there cited. *Pomeroy* v. *Mills,* 3 Vt. 279. *State* v. *Catlin,* 3 Vt. 530. *State* v. *Wilkinson,* 2 Vt. 480. *Tisdale* v. *Norton,* 8 Met. 391.

II. If it was a highway, the facts reported do not show that Jamaica was bound to keep it in repair. The liability does not arise from the fact that it was a highway. Rev. Stat. 139 § 26. Slade's Comp. 432 § 13. *State* v. *Wilkinson,* 2 Vt. 480. *Page* v. *Weathersfield,* 13 Vt. 424. *King* v. *Inh. of St. Benedict,* 4 B. & A. 447. Nor from the acts of Watson for he had no power as highway surveyor, to perform them. Rev. Stat. 135 § 4, 137 § 15, 138 § 21. *Briggs* v. *Guilford,* 8 Vt. 264. *Page* v. *Weathersfield,* ub. sup. *Willard* v. *Newbury,* 22 Vt. 458. 14 Vt. 288 17 Vt. 40. Nor from the neglect of the town to replace the bridge which only subjected them to indictment, and to a liability to pay damages sustained by reason of that neglect.

III. The plaintiff cannot recover on account of the insufficiency of the highway proper, for the death of the intestate was not the natural and proximate consequence of the defect complained of· *Tisdale* v. *Norton,* 8 Met. 391. *Baxter* v. *Winooski T. Co.* 22 Vt. 124.

IV. The intestate in attempting to ford the stream was guilty of a want of ordinary care. *Care* is as the *risk* voluntarily taken; and the motive of the party is unimportant, for it cannot affect the risk in kind or degree. Story Bail, § 14-15. No such doctrine as that contended for, that care is as the motive to take the risk, was ever heard of in the road law of Vermont. *Noyes* v. *Morristown,* 1 Vt. 353. *Briggs* v. *Guilford,* 8 Vt. 264. *Hunt* v. *Pownal,* 9 Vt. 411. *Bardwell* v. *Jamacia,* 15 Vt. 438. *Kelsey* v. *Glover,* 15 Vt. 708. *Allen* v. *Hancock,* 16 Vt. 230. *Rice* v. *Montpelier,* 19 Vt. 470. *Cassedy* v. *Stockbridge,* 21 Vt. 391. *Willard* v. *Newbury,* 22 Vt. 458. And it is unheard of in the law of bailments. Story's Bail, §11 to 16. Sedg. Dam. 63.

——————— for the plaintiff.

The citizen had at common law a right to a good passage. 1 Black. Com. 357. 1 Hawk. P. C. 201. 4 Bac. Ab. 668. And in this state, at the expense of the town. Rev. Stat. 175 §1. *Batty* v. *Duxbury,* 24 Vt. 155. *Willard* v. *Newbury,* 22 Vt. 454. And it is this good passage and not the beaten track which constitutes the highway. Fitzh. Ab. 177. *Sr. Ed. Duncomb's case.* Cro. Car. 366. Rolls. Abr. 390. Here the good passage was manifestly insufficient, and for, or "by means" of the want of it, Dr. Hyde lost his life; when, but for such want of it, there is no reason to suppose the event would have happened. *Cassedy* v. *Stockbridge,* 21 Vt. 391. And taking this view, the injury was directly and immediately in consequence of the obstruction, and occasioned thereby. *Lester* v. *Pittsford,* 7 Vt. 158.

II. A public highway is an easement or passage common to all citizens for the purpose of travelling from town to town. 1 Hawk. P. C. 201. Coke Lit. 56. 6 Mod. 255. Such a highway was the way leading from North Wardsboro to West Townshend, and it is found that it was usual, when it was out of repair, for the citizens to pass by the outlet within which the injury happened. This

outlet was a part of the highway, 1 Hawk. P. C. 201. Cro. Car. 366. 4 Vin. Ab. 502. And although it appears not by whom it was built, this can make no difference so long as the town ought to furnish it. *Queen* v. *Inhab. of Hornsey*, 10 Mod. 150. *Briggs* v. *Guilford*, 8 Vt. 266, *Willard* v. *Newbury*, 22 Vt. 464.

III. But it is found that it was repaired by the highway surveyor. His act was the act of the town to which he was liable for neglect of duty. Rev. Stat. 175 § 4, 177 § 17, 178 §20, 180 § 31. *Gasset* v. *Andover*, 21 Vt. 342.

IV. Independent of its connection with any other road,—that by the ford was a public highway. It was in existence previous to there being any bridge, and it was used until the bridge was constructed. The mere making a new road and bridge did not, *ipso facto*, discontinue the highway through the bridge ; and no other discontinuance is pretended. To divest the public of their right by *non user*, the land owner should have interrupted them by a claim of right, which he did not do. *Knight* v. *Heaton*, 22 Vt. 480.

V. The motives which influenced, are proper to be considered in determinating the prudence and care of the intestate. Ordinary care may be defined, that care which men of common prudence generally exercise *in similar circumstances*. Story's Bail, § 11. *Kelsey* v. *Glover*, 15 Vt. 712. *Green* v. *Danby*, 12 Vt. 338. Care is a mental or intellectual quality, not a physical thing or predicable of a mere physical existence. In determining whether an individual mind has employed and exercised it, in a given case, we must look at the operations of that mind and weigh all the circumstances which it could legitimately and properly have weighed in deciding its conduct. This the court did in *Kelsey* v. *Glover*, 15 Vt. 712.

Consideration of the circumstances and motives which would have justified the intestate or others in attempting to cross the stream.

Opinions were delivered by each of the judges, as follows.

BENNETT, J. If this action can be maintained, (going upon the ground that the intestate was in the exercise of ordinary care, at the time of the accident,) it must be, I apprehend, either because the fordway in question became a part of the highway, which the town was bound to repair, or else because of their neglect to rebuild

the bridge within a reasonable time; and their omission, in the mean time, to build and keep in repair a safe fordway. If it could be established that this fordway became a part of the highway, the case, in my mind, would be free from difficulty on this point; but a highway is to be established by regular legal proceedings under the statute, or else by dedication or prescription, and I know of no other mode. The road must *be opened*, before the town can be made liable to a private action, for its insufficiency. To render a town liable in any form of action, even to an indictment for the insufficiency of a road, they must have the right to enter upon the land to make and repair the road. This may be said to be self-evident. See *Todd* v. *Rome*, 2 Greenleaf, 55. There is no pretence that the adjoining proprietor's land, where the fordway was, had been taken for public use, under the statute, which requires compensation to be made. This fordway had not, I think, become a part of the highway by *dedication* and *adoption*. No dedication of the land, by the owner, is found; and there was no evidence from which it could be found, and no evidence that the town had opened this fordway for travel as a public highway. The most that can be said is, the landholder might have suffered it to be used, as a way, and this license was, at his pleasure, *countermandable*.

To constitute a highway by dedication, which the town are bound to repair, there must be a dedication of the land by the owner, and an acceptance of the dedication by the town; otherwise it would be in the power of an individual to impose upon a town a liability to make and keep in repair a road, *nolens, volens*. As has already been said, before a town can be made liable, the road must have been opened for travel, either according to the statute, or else, in the case of a dedication, *by acquiescence* and *adoption*, as was held in *Blodgett* v. *Town of Royalton*, 14 Vt. 290. In *Bailey* v. *Town of Fairfield*, Brayton 128, the road had been used as a road for common travel twelve or thirteen years; yet it was held there must have been some further act on the part of the town, recognizing it as a public highway to make it such. See also *Paige* v. *Weathersfield*, 13 Vt. 424, and *Young* v. *Wheelock*, 18 Vt. 495.

In *Estes* v. *Troy*, 5 Green, 368, a user of a road by the town for ten years, it was held, would not oblige them to repair it, and in *Curtis* v. *Hoyt*, 19 Conn. 154, it was expressly held that to

create a highway by adoption, the road must have been made and accepted by the public; and the courts of Massachusetts have held that the assent of the town to the dedication must be *expressed* or *implied*, and if the road had not, in form, been opened, it must have been in some way adopted by the town. *Commonwealth* v. *Charlestown*, 1 Pick. 180; *Hobbs* v. *Lowell*, 19 Pick. 405, 411, opinion of MORTON, J., and *Bowers* v. *Suffolk Manf. Co.*, 4 Cush. 340; and *Rex* v. *St. Benedict*, 4 B. & A. 447 is to the same effect. If, in the case now before the court, there had been a dedication shown by the landholder, it is clear there was no adoption of the road by the town; and without a dedication, no adoption of it by the town could give them a right to repair, and would be of no avail. The fordway had been used only about *twenty days* when the accident occurred, and no action had been had in relation to it by the town or their select men. Though the highway surveyor assisted others to draw the stones out of the channel in the fordway, yet nothing was done at the expense of the town, or by the knowledge or direction of the selectmen or agents of the town. The fact that the referee finds that the highway surveyor acted in his official character can avail nothing.

The duties of the highway surveyor are pointed out by statute, and he is simply to repair the highways in his district, and he has no power to lay out new highways, or adopt roads or by-ways already travelled as public highways, and, in this way, impose upon the town the duty of keeping them in repair; and, indeed, the referee does not attempt to find that there was, as matter of fact, an adoption of this fordway, as a part of the highway, by the town or its authorized agents, and certainly no such fact can be inferred from the facts, as reported by him.

Though this fordway had been used at certain times before the bridge, which went off in 1850, was built, and though the stream had been drawn out for that purpose, yet there was no showing by whom it was done. There was no pretence of a dedication of the land, and certainly there could be no implied consent on the part of the town to adopt it as a highway, and, besides, the use of it had been for a long time abandoned. All that can be said is, the landholder had permitted the fordway to be used by the public for the time being.

In *Blodgett* v. *Town of Royalton*, 14 Vt. 290, the county court charged the jury "that if they found the plaintiffs had suffered "the damage claimed, in consequence of the insufficiency or want "of repair of said road, after it had *in fact been opened and travelled* "*as a public highway with the knowledge and consent of the select* "*men of the town*, they might find for the plaintiffs, &c." Though it is distinctly admitted that a town may adopt a road as a public highway for travel, yet it was held by the supreme court in that case that the above charge was erroneous, and this, upon the ground that the fact that the road had been opened *by some one*, and had been travelled as a public highway with the knowledge and consent of the selectmen of the town was not sufficient to constitute such an adoption of the road as to render the town liable for its insufficiency. CH. J. WILLIAMS, in his opinion, uses this pertinent language, "the consent merely of the selectmen, that any "person should travel on any path, whether *a public or a private* "*road, is no act*, recognizing such a road as a highway for which "the town is responsible, neither is their knowledge that a traveller "on such a road supposes it to be a public highway of any impor-"tance, unless by some act of theirs, it can be inferred that they "have opened the road or adopt it as a highway to be repaired by "the town." We know of no distinction whether the road, for the insufficiency of which it is sought to render the town liable, is more or less important, whether it be the principal road or simply a *by-road*, which the traveller may have resorted to for the time being. The principle is, that in either case to render the town liable for want of repairs, if it has not been opened according to the requirements of our statute, it must have been adopted by the town or the select men as their agents. A by-way without the limits of a public highway may become an integral part of a highway by adoption, but this must be shown to have been the fact upon competent proof and authority, and the acts of unauthorized agents can not bind the town. To hold that the town are liable for the insufficiency of this fordway, upon the ground that it had been opened by *some one*, and the town had permitted it to be travelled, while in an unsafe condition, is, to my mind, to hold in direct conflict with the cases of *Blodgett* v. *Royalton* and *Bailey* v. *Fairfield, Bray.* 128, and in conflict with the statute which confines

the right of action to injuries on such roads, as the towns *are bound to keep in repair*. The fallacy of the position, in my mind, arises from taking for granted the thing in dispute, that is, that the town was legally bound to keep in repair this fordway.

The question then arises, should the town be made responsible because of their neglect to rebuild the bridge within a reasonable time or because of their omission to build a safe fordway. We will consider these inquiries separately; and first, as to the neglect of the town to rebuild the bridge. It may be admitted that the death of the intestate resulted indirectly from the want of a proper bridge, but this was not the *proximate* cause of it. If the town were liable for damages, at common law, for defects in a highway or a bridge which they were bound to keep in repair, the case would indeed be widely different. The principle that if one individual sustains damage from the neglect of another, the latter must be responsible to the former, would then apply; and it would be no answer to say the damages were *consequential*. The same rule might be applied to a private corporation created for their own benefit. But a town or other municipal corporation, created for the purposes of government are not subjected to the same rule, and no private action will lie against them, at common law, for a neglect of duty, though an individual suffers damage. Brookes, Abr. Title, Action on the case, pl. 93. *Russell et al.* v. *Men of Devon*, 2 Term 667. *Mower* v. *Leicester*, 9 Mass. 250; *Chedsey* v. *Canton*, 17 Conn. 475; and *Reed* v. *Belfast*, 20 Maine, 246. *Baxter* v. *Winooski Turnp. Co.* 22, Vt., 114. The case of the Stage Co., decided in Rutland county about the same time, as the case in the 22d Vt. (not reported) must have proceeded upon the same ground. In that case a bridge had been carried off, which the defendant town had omitted wrongfully to repair, and the stage, by reason thereof, had been compelled to go a longer and circuitous route, at an increased expense and delay; and yet the action was not sustained. If the town had been liable to an action at common law, the action should, I apprehend, have been sustained.

This, then, being an action given by statute, we must look to the statute to see its extent. The language is, " if any *special damage* " shall happen to *any person, his team, carriage or other property* " by means of the insufficiency or want of repair of any highway

" or bridge in any town, which such town *is bound to repair, &c.*"
It is well settled in this and in other states, under statutes similar,
if not identical with ours, that to warrant a recovery, the damages
must be *direct* to the person of the traveller or his property, and
that the insufficiency of the highway or bridge must be the *proximate* cause of the injury, and that it is not enough that it was the
*remote* cause.

It is upon this principle that the party injured is held to the use
of ordinary care, to entitle him to recover.  The intestate went
without the highway because the bridge was gone ; but the injury
arose directly because of his attempt to pass the fordway.  The
bridge being gone, was the remote or primary cause of the injury ;
his travelling the fordway the *proximate* cause.  See *Trow* v. *Vt.
Central R. Co.*, 24 Vt. 487, where the question is fully and ably
considered.  See also *Tisdale* v. *Town of Norton*, 8 Met. 388 ;
*Holman* v. *Townshend*, 13 Met. 297 ; *Harwood* v. *Lowell*, 4 Cush.
310 ; *Brailey* v. *Southborough*, 6 Cush. 141 ; *Chedsey* v. *Canton*,
17 Conn. 475 ; *Reed* v. *Belfast*, 20 Maine, 246.  The case *Tisdale*
v. *Norton* is, in principle, much in point, and almost identical in
the facts with the case before the court.  The plaintiff in that case,
to avoid a gully, which had been in the road twelve days and rendered it wholly impassable, turned out upon the adjoining lot, and
was upset and injured, and the jury had found he exercised due
care, but it was held the town was not liable, and upon the ground
that the gully in the road was not the proximate cause of the
injury.  This action, then, cannot, I think, be sustained, by virtue
of our statute, simply because the town had neglected to rebuild
the bridge within a proper time; and the plaintiff sustained a
damage from that neglect as the *remote* and not the *immediate* cause.
In *Baxter* v. *Winooski Turnpike Co.*, 22 Vt. 114 it was considered
that the damage for which an action could be maintained must
result *immediately* from the insufficiency of the road, and such are
the cases in our sister states.

It remains to be seen, whether, upon principle, this action can be
sustained, because the town neglected to open and make a safe
fordway.  If this injury had been caused purely from the ordinary
height and force of the water, it would hardly be claimed that the
town was liable because they had not built a temporary bridge ;

yet, where is the stopping place ? Our statute (Comp. Statutes, Williams' Edition, p. 163) gives the selectmen of a town power, when *any* highway or bridge shall have been suddenly carried off or swept away, to change their location, if necessary, to lands adjoining, and when so changed they may *forthwith open the same for working and public travel, first paying the land damages.* But if we suppose they neglect their duty in this respect, there are other methods to compel them to do it, aside of a private action, as was well said by CH. J. WILLIAMS in the case of *Young* v. *Wheelock,* 18 Vt. 497. See also *Farnum* v. *Concord,* 2 N. H. 392. Suppose a town should neglect to work a road, and open it for travel by the time fixed by the court, no one could hardly claim that a private action could be maintained, though an individual might have sustained special damage from such neglect. And where is the difference in principle in the two cases ? The town in the case before us, as the facts stand, had acquired no right to work and repair the fordway, and open it for travel.

If this action can, upon this ground, be maintained, it is because the selectmen of the town neglected an *official duty.* But *official* neglect of the agents of a municipal corporation as a town is not to be redressed by private action, unless given by some statute. The statute gives a *private action* for not keeping the road in repair already opened, not for neglect in opening a road. The two things are quite different.

I apprehend that the intestate had no legal right to pass the fordway, which he could assert even against the landholder. The traveller on a highway, when obstructed by some sudden and temporary cause, may, *from necessity,* pass upon the adjoining land without being a trespasser ; but it is a *non sequitur,* that the town, even in that case, would be liable for a defect in the road he chose to travel. See *Taylor* v. *Whitehead,* Doug. 745 ; *Bullard* v. *Harrison,* 4 M. & S. 392. 4 Law Lib. 50. Dane Abr. 258. *Tisdale* v. *Norton,* 8 Met. 388 ; and *Campbell* v. *Race,* 7 Cush. 410. It is, however, a right of way, originating and continuing in a strict necessity, and in the case from the 7 Cush. 410, the court say, the right does not rest upon any peculiar ground, but is based upon the familiar principle that to justify or excuse a trespass, inevitable necessity or accident must be shown. If another high-

way leads to the point of destination, though not as near as the one which is obstructed, and more difficult to be travelled, it then becomes a question of convenience which the traveller will go, and no such necessity exists, as will give a right to turn out upon the adjoining land, or excuse a trespass. *Pierce* v. *Selleck*, 18 Conn. 330 *Nichols* v. *Luce*, 24 Pick. 102. *Witten* v. *Harmon*, 1 McCord. 65; and *McDonald* v. *Lyndon*, 3 Rawle. 492. In this latter case, the rule is laid down thus, " a way *of necessity* never exists where a "man can get to his own property through his own land, *however* " *inconvenient* the way through his own land may be." In fact, a way of necessity, *ex vi termini*, imports a right of passage through the lands of another as indispensible. To hold that it may rest *in convenience*, would be to violate the right of the exclusive dominion, which a man has in his own soil, and the sacredness of which is secured to him by the laws and the constitution. The intestate was at North Wardsboro, and wanted to go home, a distance of five miles, and the difference in the two roads only one hundred and nineteen rods, though it is found the hill road was not as good, and travelling over it tedious and uncomfortable, yet this would not create a right of way *of necessity*. The intestate went the hill road, and could as well have returned that road as the other, although a little more time might have been required. If the intestate had professional engagements which required him to be at home at a given hour, all that was necessary for him to do was to start in season to have met his engagements in going the hill road, and the difference in time required to travel the two roads, starting from the village of North Wardsboro could not be great. He, like other men, was master of his own time, and his election as to the road which he would travel was matter of *comparative convenience*, and not *of necesssity*. He, then, could not justify his going upon the lands of the adjoining proprietor as being of necessity; and if a trespasser against the landholder, it would seem but a reasonable deduction, that he went at his own peril, and that he could not set up matter which rested in his *own convenience* as a reason why the town should be liable for his misfortune. It might be remarked that the bridge had been gone some time, and this known to the intestate, and the necessity of his returning that way, such as it was, was of his own voluntary creating.

If this fordway had not become a part of the highway and the intestate had no right of way from necessity across it, it is difficult to see how the town can be made responsible for consequences.

The case of *Willard* v. *Newbury*, in the 22d of Vt., and of *Batty* v. *Duxbury*, in the 24th of Vt., are much relied upon by counsel, in support of this action; but both are distinguishable from the case at bar. In each, the obstruction of the highway was caused by the action of the railroad company, by their occupying the highway for the construction of their railroad, under the authority of the legislature of this state; and the case of *Willard* v. *Newbury*, has but little bearing upon the present case. In that case, the company had laid their road across the highway, and in building an arch for the highway to pass over the railroad, they had obstructed the highway with blocks of granite, and the injury happened to the plaintiff while travelling the old highway; and the jury had found, that the town were wanting in ordinary care, in not keeping up bars or railing, to warn people of the danger of travelling the old road;—the accident happening, in that case, in the night time.

When it was once settled that the town was liable for the acts and the negligence of the railroad company, it followed necessarily, that that action was well brought. What may have been said, by the learned judge who gave that opinion, beyond the case, cannot be treated as authority. What should have been the result, had the injury happened on a by-way, was a point not before the court, and not decided.

The case of *Batty* v. *Duxbury*, 24 Vt. 155, is more in point; but that case, though similar, in many of its facts, with the case before us, yet it is far, I apprehend, from being identical. In that case, the obstruction of the highway was by a positive act of the railroad corporation, under the authority of the legislature of the state, and the obstruction of the highway was to be permanent. The company had located their railroad nearly one hundred rods upon the highway, and to render the old highway of any use, there must have been a road for public travel without the old highway. Besides, the charter of the railroad company, section 10, gave the company power, when necessary, to locate their road across, or upon, any highway; and it provided, also, that the company should

restore the road to its former state and usefulness, as near as prac-
ticable, and to the acceptance of the select-men of the town,—and
in case of their refusal, to the acceptance of the commissioners
appointed to assess land damages.   In that case, the only way of
restoring the highway to its former usefulness, was by making a
new road, as a substitute for so much of the old road as had been
taken by the railroad company.   When it should become necessary
that the highway should be taken to lay the track of the railroad
upon, the legislature must have contemplated that the taking of it
would operate, practically, to discontinue so much of the old high-
way, and that the new road was to be substituted in its place, and
to possess all the qualities of a highway, and be kept in repair by
the town, (especially after it had been accepted by the select-men
or commissioners,) and the town would be subject to indictment
or private action, for its insufficiency, the same as in case of other
roads, under the general laws of the state.   Without giving this
construction to the 10th section of the railroad charter, the pro-
vision would be incomplete; and, I think, it is fully implied in the
act itself, that when the railroad company have made a new road,
and it has been accepted by the select-men, or the railroad com-
missioners, in case of the refusal of the select-men, it becomes, to
all intents and purposes, a highway of the town.   The railroad
company, in the Duxbury case, located their road upon the high-
way, in the summer and fall of 1849 ; and at that time, the road
was in fact occupied by the company, and was impassable ; and
they then made the new road, upon which the accident happened,
and it was used as a way for public travel, from the early part of
the fall of 1849, until the 22d of the February following, when
the accident happened, for which the suit was brought.   We are,
of course, to take it that if the company made this new road for
the town, they had procured the right of way, by purchase or
otherwise, and no question of the kind was raised upon the excep-
tions in the case.

Though the case shows that the new road had not been accepted
by the select-men of the town, in point of fact, nor by the commis-
sioners, yet the town had suffered it to be used by the public, as a
public road, for some six months, without any *caveat* on their part;
and this, taken in connection with the fact that the railroad com-

pany, by their charter, were bound to make this road, in ease of the town, in the place of the road which they had taken from the town, and were thus doing what the town might be compelled to do, shows that there may be some propriety in regarding the railroad company, in a sense, as the agents of the town, so far as the public are concerned, and their acts, as the acts of the town, and conclusively binding upon the town.

The railroad company had made this road for the sole purpose of its being used, as a public highway, and to be accepted of them, by the town, as such; and as it was in fact used as such, by their consent and permission, as the case must necessarily imply, and was the only means by which the old highway could be used, as a road of travel, it is quite clear that it must be taken; that the railroad company acquiesced in this road being opened for travel, as a substitute for the old road, and such as they were bound to make for the public; and it is a question whether their acquiescence may not be regarded as the acquiescence of the town, so far as the public are concerned, and binding upon the town, and that the public should not be called upon to discriminate between the acts of the railroad company and the acts of the town, in relation to the making and opening this road, as a road for public travel.

If this is so, then the fact that the town themselves had never done any act to recognize this new road as a part of the public highway, could have been of no avail; and in the case of *Mathews* v. *Winooski Turnpike Company*, 24 Vt. 480, the same learned judge who pronounced the opinion of the court in the case of *Batty* v. *Duxbury*, says, " the two cases are as nearly the same as it is pos-" sible to conceive, at least, in principle."

The Winooski Turnpike Company had, in the case of Mathews, clearly acquiesced in the alteration of their road, as made by the railroad company. They used it as a part of their road, for which they took toll, and repaired it; and the jury under the charge of the county court had found that the turnpike company had adopted the substitute as a part of their road.     If the case of *Batty* v. *Duxbury* can be treated as one where the town are held liable upon the ground of having, in legal effect, adopted the road that had been made by the railroad company, as a part of their highway, then in principle it is the same as the case of *Mathews* v. *Winooski*

*Turnpike Company,* but otherwise the two cases, to my mind, are widely different. I fully accede to the soundness of the decision in the case of *Mathews* v. *W. Turnpike Company,* and if the case of *Batty* v. *Duxbury* is a case of a legal acquiescence in the adoption by the town of the new road, (of which it is possible there may be some doubt,) I fully accede to that case; but otherwise, I cannot bring my mind to see its soundness; and it appears to me that, upon any other supposition, it is opposed, in principle, to the case of *Blodgett* v. *Royalton,* and in effect extends the liability of the town beyond the statute.

But, if we treat the fordway as a part of the highway, I think the plaintiff cannot recover. To entitle him to a judgment, the intestate must have been in the exercise of ordinary care at the time the accident occurred. The report finds, that a man of ordinary care and prudence, would not have attempted to ford the stream, at the time and place the intestate did, unless, as matter of law, it is allowable to take into consideration his motives, or, in other words, the urgency of his business, and in that event, the referee exculpates the intestate from the charge of a want of ordinary care, in essaying to pass the stream. I apprehend the true inquiry in a case like this would be, had the intestate, as a man of ordinary prudence, after making suitable observation and examination, good reason to believe that, with due care, he could pass in safety. If he had, he was justified in making the attempt, whether he had any special business, or was merely on an excursion of pleasure. If he had not good reason to believe that he should go over in safety, but from the urgency of his business was led to try it, when otherwise he ought not, and would not have done it, it strikes me he took the risk upon himself. If the question of ordinary care is to be graduated according to the urgency of a man's business, the rule would be a very sliding one, and of the most difficult application. I should apprehend the good sense of the case would require that all those circumstances should be taken into consideration, which go to increase or diminish the probability that the stream could be passed in safety, and without accident, and that beyond this we cannot go; and whether the traveller would, in every reasonable probability, pass in safety, was in no way dependent upon the urgency of his business. It does not appear that there was any primary necessity, that the intestate

should have returned the "Branch" road. The Hill road was but 119 rods further, and there could not have been a great difference in the time required to travel it, and it must have been to a great extent a question of convenience with the intestate, which road he would travel.

This may be very material on the question of ordinary care, if we are to take into the account the urgency of a man's business. But I apprehend the true rule is, to regard such facts and circumstances only, as either directly or indirectly bear upon the hazard or safety of the undertaking. No one can suppose that the intestate intended to act rashly, but that is not the question. Did he in fact act with ordinary prudence? It is not what he may have thought about it. His own idea of his own conduct, cannot make evidence for him, thought it might be evidence against him. But suppose it be granted that the intestate was not in fault in attempting to pass the stream. This is not, I think enough. He must have driven with due care and prudence while in the stream. No principle is better settled, than the one which requires of the traveller due care at the time when the accident happened, and the use of every reasonable means to avoid injury. The report finds distinctly that there was no evidence to prove what took place, after the intestate entered the stream, or of the particular manner in which the accident happened.

The exercise of ordinary care is not to be presumed, but it must be proved as an affirmative fact and the burden of proof is upon the plaintiffs. If the proof is insufficient, the consequences must fall where the *onus probandi* rests. *Lester* v. *Pittsford*, 7 Vt. 162. *Adams* v. *Carlisle*, 21 Pick. 146. *Merrill* v. *Hampton*, 26 Maine; 231. See also 31 Maine, 228. *Spencer* v. *Utica & Sch. R. Co.* 5 Barb. 337.

Special care is always necessary in driving through a high stream; unless the horse is driven with a taut rein and pressed forward, he will almost be sure to be carried down stream, and to my mind it is highly probable, that the horse in this case was induced to give way to the force of the stream by being driven with a slack rein, or permitted to falter in his course.

Considering this case of very considerable importance, and it having been twice very fully argued, I have been led to examine

31

the various positions taken by counsel, both upon principle and authority, as they present themselves to my mind; and for the reasons which I have assigned, I think the plaintiff cannot retain his judgment in the county court, and in that opinion my brother ISHAM concurs, not intending to express any opinion as I under-stand him, as to the liability of the town for any insufficiency in the fordway. The judgment of the county court is therefore reversed, and judgment on the report for the defendants to recover their costs.

ISHAM, J.   I think this action cannot be sustained.   The referee has stated in his report, "that a person of ordinary prudence, " merely desirous to make progress in his journey, but actuated by " no particular motive for haste, and driving such a horse as was " driven by Dr. Hyde, would not have ventured to attempt to cross " the stream at that time and place." This fact, independent of all other considerations which have been urged, should determine the result of the case.   It has uniformly been held, in cases of this character, "that, if the injury was occasioned, wholly or in part, " by the negligence or misconduct of the party himself, he cannot " recover." If the injury was the result of a want of ordinary care, by the plaintiff, or of causes which common sagacity and forecast could have anticipated and provided against, no action can be sustained.   *Noyes* v. *Morristown*, 1 Vt. 353.   *Briggs* v. *Guilford*, 8 Vt. 264.   *Lester* v. *Pittsford*, 7 Vt. 158.   *Kelsey* v. *Glover*, 15 Vt. 708.

The question in relation to the exercise of ordinary care, by Dr. Hyde, on that occasion, is not affected by any confidence or belief which he may have had that the stream could be forded with safety. His personal convictions of that character, however strong they may have been, are not to be taken into consideration in ascertaining whether he was, on that occasion, in the exercise of ordinary prudence.   In the case of *Vaughan* v. *Menlove*, 7 C. & Payne, 525, 3 Bing. N. C. 468, it was held by Tindal, Ch. J., "that the party " was, under the circumstances, bound to adopt such measures as " might be supposed would be adopted by a man of ordinary care " and prudence; and that it was not enough to show that he had " acted *bona fide*, and according to the best of his own individual

"judgment;—a doctrine," he observed, "that would utterly preclude "any certain and intelligible rule on the subject." Ordinary care, is that degree of diligence, which is exercised by men of ordinary prudence, when placed under similar circumstances. It involves the consideration of the difficulties and obstacles to be overcome, and the means or power of the party to overcome them. If men of ordinary prudence would regard the ability of the party inadequate for that purpose, without hazard or danger, the risk should not be assumed; for, no action will lie for injuries arising in that manner.

The facts found by the referee places this case, I think, within the application of this principle. The desire of Dr. Hyde, to proceed in haste, however strong or humane may have been his motive, or important his business, does not affect the case, or the question of his exercise of ordinary prudence on that occasion. His motive or desire did not, and, from the nature of the case, could not, increase his power or ability to overcome the difficulties which existed in crossing the stream. Whether those motives existed or not, the same disproportion existed between his power of resistance, and the difficulties to be resisted and overcome. If there would be a want of ordinary care or prudence when no such desire or motive existed, it would be equally so when they did exist; for, in each case, the liability to accident and injury is equally as certain and unavoidable. It is very true, that a person influenced by the considerations and motive, which, it is said, influenced Dr. Hyde on that occasion, would be induced to become venturesome, and would encounter greater hazards. But if he steps beyond the bounds of ordinary prudence and care, it is done on his own responsibility, and not at the risk of the town.

The most favorable light in which this case can be considered, on the part of the plaintiff, is to regard it as one of mutual negligence in these parties. Assuming, for the purposes of this case, that the town were under obligation to make this road, to put and keep the same in repair for public use and travel, and that they have been negligent in these particulars; still, Dr. Hyde was not in the exercise of ordinary prudence in attempting to cross the stream on that occasion. The accident which occurred, and the injury which has been sustained, was the immediate and proximate result of this

want of ordinary care on the part of Dr. Hyde. Under such circumstances, there is great unanimity in the authorities, that this action cannot be sustained. The case of *Tisdale and wife* v. *The Inhabitants of Norton*, 8 Met. 388, is very analogous to this case, and it would seem to be decisive.

REDFIELD, CH. J., dissenting. I feel no disposition to enter into any labored argument in vindication of my opinion. It is not probable the decision, being by a divided court, will be regarded as establishing any important principles in the law, upon matters hitherto controverted.

I. In regard to the liability of the town for the defect in the ford, as a temporary crossing place, I understand the majority of the court are satisfied that the former decisions of this court do render the defendants liable. It may be true, perhaps, that towns are not liable to indictment for not making temporary by-ways, when the highways are rendered impassable. And even if they were, no action lies against them, at the suit of any person thereby delayed or put to inconvenience, in his journey, by reason of such omission. But if such by-way is opened, even by a stranger, and suffered to remain open, and in an unsafe state, the town are liable for any injury, by reason of travelling such open highway. Strangers or travellers are not obliged to consult the public records, or inquire into the history of building such highways, before they are entitled to use them. If suffered to remain open to public use, the town are bound to see that they are in a safe state for public use. This was virtually decided in *Blodgett* v. *Royalton*, 14 Vt. 288, and more fully in *Batty* v. *Duxbury*, 24 Vt. 155, and is very distinctly recognized in many of the intervening cases. And now that a case occurs, where the by-way was actually opened by the highway surveyor of the district, and had been in constant use for many weeks, it seems little less than trifling with the former decisions of the court, to attempt to distinguish it, in principle, from the other cases. If the court, or a majority of the court, see fit to recede from their former decisions, it is all very well, and perhaps might be more satisfactory to the profession, and more consistent with some of the decisions in other states. I have no fault to find with such course. It is not uncommon to find, among the profes-

sion, and with the judges sometimes, more respect for decisions made elsewhere, than in our own courts. This is natural perhaps, certainly so to some men, while others perhaps are too much eaten up by a foolish conceit of our own infallibility. I think there may be danger of error upon both grounds. I have nothing to object against overruling a case, fairly and fully. If done oftener than it is, it might be better. But to do it by indirection and evasion, and undue refinement, generally answers no good end, and always invites attack upon all the cases in the reports, upon similar grounds. We cannot justly expect the profession to treat our cases with more fairness, candor and respect, than we do ourselves. If the profession, in some portions of the state, have no just respect for the decisions of this court, (and in this I do not refer to this county, whose bar is too able to justify any such remark,) it is not altogether attributable to the consummate wisdom and learning of the bar. Something of this temper, where it shows itself, may fairly be put down to the score of the willingness of the judges to escape from the authority of a former decision, upon the ground, not that it was incorrect and unsound, but that it *might* have been put upon different grounds! I hold that, if a decision is authority at all, it is upon the ground upon which it was made. It seems to me like an absurd refinement, to say that, a decision is authority, for some ground upon which it was *not* decided, and no authority for the very ground upon which it *was* decided. If such reasoning is satisfactory to other minds, I am glad of it.

II. The other question in the case, I regard as altogether one of fact, and conclusively settled by the finding of the referee. I think the referee has undertaken to make the case plainer, and fairer, and more fully to shadow forth the conflict of evidence and argument, than he need to have done, and has thereby rendered what would otherwise be plain, more or less confused and uncertain. And still, it seems to me impossible to say that the question of care and prudence is not conclusively found for the plaintiff. For, negligence and prudence are both relative terms, and measured chiefly with reference to the peculiar circumstances by which the subject is surrounded. To illustrate the matter, with reference to travelling the highway. Is it not true that my necessity, the urgency of my business, the health of my family, or a friend at a

Wardsboro and Townshend v. Jamaica.

distance, may justify me, fairly and fully, in attempting to travel the highway, in a night so dark or so tempestuous, as under no such pressure or exigency, every man will pronounce the height of negligence and fool-hardy presumption? The illustration may be carried to any extent. And the more it is discussed, the more it will appear, that negligence, or prudence, is strictly a relative term, dependent upon the peculiar exigencies of one's position. Aside from the finding of the referee, I admit the case is very doubtful upon this point, and so the referee undoubtedly regarded it, and, on that account, has attempted to present a picture of the case to the court,—but still understanding, and intending, so far as rested in his province, to find the point in favor of the plaintiff. I do, therefore, upon both grounds, regard the plaintiff as entitled to judgment, upon the report.