## N. Y. SUPERIOR COURT.

A. EMILIUS OUTERBRIDGE and JOHN S. SCOTT, plaintiffs, agt. ROYAL PHELPS, defendant.

*Right of way — rule of law as to — Easement.*

Where the owner of two or more tenements sells one of them, or the owners of an entire estate sells a portion, the purchaser takes the tenement or the portion sold, with all the benefits which appear at the time of the sale to belong to it, as between it and the property which the vendor retains.

But no burden or servitude can be imposed by the vendor upon the tenement or portion sold, in favor of the property retained by him in derogation of his grant, without a reservation expressed in the grant,

unless an apparent sign of servitude exists on the part of the tenement or portion sold, in favor of the property retained and the easement claimed is *strictly necessary* to the enjoyment of the property retained.

In the latter case visibility and strict necessity must both concur, as in the case of a party wall, and especially in the case of a claim of right of way.

The right of way from necessity over the lands of another is always of *. strict necessity,* and this necessity must not be created by the party claiming the right of way. It never exists where a man can get to his property through his own land. That the way through his own land is too steep or too narrow, does not alter the case. It is only where there is no way through his own land that the right of way can exist. That a person claiming a way of necessity has already one way, is a good plea and bars the plaintiff.

*Special Term, December,* 1879.

MOTION for the continuance of an injunction restraining the defendant from cutting off a right of way claimed by the plaintiffs through the door and hallways of the building No. 29 Broadway, in the city of New York, and from tearing down or removing from the front of said building the signs of the plaintiffs.

*Sutherland & Scott,* attorneys, and *Francis M. Scott,* of counsel, for plaintiffs.

*Lord, Day & Lord,* attorneys, and *George De Forest Lord,* of counsel, for defendant.

FREEDMAN, *J.* — The case, as made by the papers submitted on both sides, involves no controversy as to the material facts. They are as follows, viz. :

The building fronting on Broadway, known as No. 29 Broadway and now owned by the defendant, was built first as a separate building. The next, immediately in the rear of the first, which, in the motion papers, is sometimes styled the " rear building " and sometimes the " extension building," was erected afterwards fronting upon Morris street and filling up the

whole space in the rear of the original building lying between
the latter and the side walls of two dwellings adjoining on the
west, and fronting and opening upon Morris street as their
only outlet.   More than twenty-five years ago all four of
these buildings were used together as a boarding-house.
While they were so used the front building had staircases of
its own in the rear of the hallway, over and through which
the plaintiffs claim a right of way.   There was an opening in
the west end of the hallway into the so-called rear or exten-
sion building; and the main and customary entrance to all
parts of the four buildings, while occupied and used together
as stated, was through the door and hallway of the building
fronting on Broadway.   But there were also staircases in said
rear or extension building connecting the upper floors with
the ground floor, from which, through doors still in existence,
access could be, and I have no doubt, as occasion required
was had to Morris street; and there were other independent
entrances from Morris street which also still exist, and by
which access could be, and was, had into the two most west-
erly buildings, and through them to all parts of the four
connected buildings.   The staircases by which access was thus
had to and from Morris street, through the two most westerly
buildings, are still standing, but are included in and covered
by lettings to tenants of the present owner.

From the intersection of Broadway and Morris street the
grade of Morris street, towards the west, is descending, so
that the first or ground floor of the building fronting on
Broadway was, and is, on a level with the second floors of
the extension building and the two most westerly build-
ings fronting on Morris street; and the ground or first
floors of the buildings last referred to were, and are, on a
a level with the basement of the Broadway building.   The
premises with these four buildings thereon were next leased
and occupied by the firm of Spofford & Tileston, who kept
open the communication which existed between the front and
rear building, and used the rooms in the front building for

their general office, and rooms in the rear parts for a record room, porters' room, water closets, coal bins, &c.

In 1863, while the premises were thus used and occupied by said firm, Paul N. Spofford became the owner of them, subject to two mortgages upon the whole, amounting in the aggregate to the sum of $50,000. These mortgages have been assigned to, and are now held by, the Mutual Life Insurance Company. From the time Spofford became the owner, he rented out offices in the buildings to tenants for business purposes.

A short time before May, 1865, Spofford made extensive alterations in the premises, for the purpose of rendering the whole of the premises suitable and available for business purposes, and put them in the condition in which they still are. Among other things, not necessary to be specially mentioned, he widened the front hall on the first floor of the front building, and continued the passageway thus widened straight to the extreme westerly end of the four buildings; and he also removed the staircase in the front building, and constructed one in the east end of the so-called rear or extension building, by which access was provided to each floor of the four buildings. From that time forward the entrances on and from Morris street ceased to be used, and the tenants of the offices in the so-called rear building were obliged, and of necessity permitted, to pass in and through the door and hallway of the building fronting and facing upon Broadway, and the tenants of the upper parts of the Broadway building were obliged, and of necessity permitted, to pass up and down the staircases erected in the rear or extension building, and all tenants, no matter in what part of the connected buildings their offices were situated, were permitted to display, and keep upon the front of the Broadway building, signs indicating their names and the character of their business. On the ground floor of the rear or extension building, situate between the building fronting on Broadway and the two most westerly buildings, there are four small shops, which face and open on Morris street, and they were

deprived of the communication that formerly existed between the ground floor and the upper part of said building.

In January, 1873, the Mutual Life Insurance Company, in consideration of $25,000 paid on its mortgages, released the entire front or Broadway building to Spofford, by an instrument containing no reservations, and about the same time Spofford mortgaged the premises so released to William Albert and Charles Hickman, as executors of the estate of Richard Adams, deceased, to secure a loan of $50,000. This mortgage contained no reservations, and was recorded February 6, 1873.

After the mortgage last referred to had been made and recorded, the plaintiffs hired from Spofford, and went into the occupation of, two rooms on the *second* floor of the so-called rear or extension building, and since 1874, their said occupation has been continued under successive annual leases. Their present holding is under a verbal letting for one year from May 1, 1879, upon the terms expressed in a previous written lease, which, however, as is admitted, contained no allusion to either a right of way through the hallway in question, or to a right to affix signs upon the Broadway front.

Spofford remained in possession of the four buildings connected as aforesaid, until December, 1878, when the premises fronting on Broadway were sold under a judgment for the foreclosure of the Albert and Hickman mortgage, and purchased by the defendant in good faith, and without knowledge of plaintiffs' claims, for the sum of $58,000. The remaining three buildings, lying and fronting upon Morris street, west of the defendant's building, Spofford retained, and they are still owned by him.

Upon ascertaining, after his bid had been accepted, the condition and use of the premises, and fearing that some right of way might be claimed by Spofford or his tenants, the defendant applied to the supreme court, which had given the judgment of foreclosure, to be relieved from his purchase. At the same time the plaintiff in the action applied to the

same court for an order directing the defendant to complete his purchase. The plaintiff gave notice of his application to all the parties who had appeared in the suit, but did not serve the papers on Spofford, who had not appeared. Spofford, however, seems to have had actual notice of both applications. They were heard together, and both decided against the defendant, and the latter thereupon completed his purchase as he was directed to do, and paid the price bid, and received his deed.

It was not until after the defendant had thus completed his purchase, that Spofford first claimed that a right of way through the Broadway building existed; and when, after due notice to Spofford and his tenants, including these plaintiffs, the defendant, having erected new staircases inside of his building, and desiring to utilize part of the hallway to increase the size of the main offices in his building, proceeded to close up the opening in his rear wall, he was stopped by the temporary injunction in this case.

The present action is not brought by Spofford, but by the plaintiffs as tenants of Spofford. They show that they are shipping and commission merchants, transacting business at the offices occupied by them as the agents of a steamship company, known as the " Quebec and Gulf Ports Steamship Company," and running numerous steamers from this port to ports in the West Indies and other places; that frequently more than 100 persons call at their said offices in the course of a single day to transact business with them, and that free and convenient access to their place of business is a matter of the greatest importance to them. They also allege that Broadway is the principal business street and thoroughfare in the city of New York; that all the important steamship companies transacting business in this city have their offices either on Broadway or the Bowling Green, and that the offices occupied by them are valuable to them only because of the entrance thereto from Broadway. They therefore claim that by virtue of their hiring they are entitled to a right of way

through the hall of the Broadway building, and to the right to affix and maintain their signs upon the Broadway front, and that the defendant cannot deprive them thereof; and they show by the affidavit of Spofford that the latter intended to and did give them these rights as far as he could do so.

If these rights exist in favor of the plaintiffs, whose lease is subsequent to the record of the mortgage through which defendant's title comes, and subsequent also to the filing of the *lis pendens* in the foreclosure suit, they must exist to the same extent in favor of every tenant occupying a room, no matter how small, in any one of the three buildings which Spofford retains, and not only in favor of every such tenant now in possession, but also in favor of every one who may come in under future leases; and thus the Broadway building must remain forever subject to the burden which thus rests upon it and materially affects its rental and salable value. For if the rights claimed exist at all, they must exist as easements which are attached to and follow the land, not the person of Spofford, and as such follow parts of the estate into the hands of the respective tenants.

The general rule, undoubtedly is, that where an easement is secured to a dominant estate and is designed to benefit the same, in whosesoever hands it may be, it will inure to the benefit of the owners of the several parts into which it may be divided, provided the burden upon the servient estate is not thereby enhanced.

At the outset it is important to observe, however, that there being, as was conceded, no right by prescription, the rights claimed must rest in a reservation in some form or way to Spofford at the time of his making the mortgage to Albert and Hickman in 1873. For since the execution of that mortgage as a conveyance to secure the payment of the sum named therein, Spofford could convey no rights to the plaintiffs but what were subject to the estate created by that instrument.

It is conceded that the mortgage in question conveyed the premises fronting on Broadway by metes and bounds in fee,

subject only to the conditions of the mortgage, and that it contained no reservation either of a right of way, or of any other right in favor of any of the other premises retained by Spofford ; and, as a general principle, no reservation is implied in a grant, it would seem to follow that the rights now claimed are not well founded.

Thus, in *Burr* agt. *Mills* (21 *Wend.*, 290), where a man had conveyed without reservation part of a tract of land which was at the time flowed by a mill-dam belonging to him, and had retained the other part on the stream below, it was held that his right to continue to flow the land conveyed was gone. COWEN, J., states the principle as follows : " After having sold the land absolutely, Nathaniel Burr, the testator, had no right of flowing left which he could devise to his four grandchildren. It can make no difference that there was then a dam built which flowed this land. If a man convey land which is covered by his mill-pond without any reservation, he loses his right to flow it. There is no room for implied reservation. A man makes a lane across one farm to another, which he is accustomed to use as a way ; he then conveys the former without reserving the right of way ; it is clearly gone. A man cannot, after he has absolutely conveyed away his land, still retain the use of it for any purpose, without an express reservation. The flowing or the way are but modes of use, and a grantor might as well claim to plough and crop his land. If the mill had been first sold by Nathaniel Burr to another, it would have been different ; for the right of flow would have passed to that other as an incident, and could not then be cut off by the grantor."

The plaintiffs rely, however, upon the principle enunciated by SELDEN, J., in delivering the opinion of the court of appeals, in *Lampman* agt. *Milks* (21 *N. Y.*, 505), and upon other reported cases which it is claimed establish a rule similar to that stated in the case first mentioned. Judge SELDEN says : " The owner of real estate has, during his ownership, entire dominion and control over its various natural

qualities, and may dispose of and arrange them at will.  He may alter the natural distribution of those qualities, so as essentially to change the relative value of the different parts, and may, in a great variety of ways, make one portion of the premises subservient to another.  \* \* \*  The rule of the common law on this subject is well settled.  The principle is, that where the owner of two tenements sells one of them, or the owner of an entire estate sells a portion, the purchaser takes the tenement, or portion sold, with all the benefits and burdens which appear, at the time of the sale, to belong to it, as between it and the property which the vendor retains.  This is one of the recognized modes by which an easement or servitude is created.  No easement exists so long as there is a unity of ownership, because the owner of the whole may, at any time, rearrange the qualities of the several parts.  But the moment a severance occurs by the sale of a part, the right of the owner to redistribute the properties of the respective proportions ceases, and easements or servitudes are created corresponding to the benefits and burdens mutually existing at the time of the sale.  This is not a rule for the benefit of purchasers only, but is entirely reciprocal.  Hence, if, instead of a benefit conferred, a burden has been imposed upon the portion sold, the purchaser, provided the marks of this burden are open and visible, takes the property with the servitude upon it.  The parties are presumed to contract in reference to the condition of the property at the time of the sale, and neither has a right, by altering arrangements then openly existing, to change materially the relative value of the respective parts."

In that case a certain water-course had been diverted into an artificial channel, thereby freeing from water land which, *in that condition,* was sold to the plaintiff, and upon which he had built a barn, and it was held that neither the vendor, nor his subsequent grantee of the remaining portion, could close the artificial channel, and thereby again flood plaintiff's land.  It was a case, therefore, where the implication of the

imposition of a servitude was sustained not in favor of the grantor, but of the grantee, and hence it is evident that the proposition that a similar implication arises in favor of a grantor and against a grantee, was not involved in the decision of the case so as to become conclusive authority, and that judge SELDEN did not intend thereby that it should be applied to all cases which by possibility might be brought within its broad language.  In another part of the opinion he had himself stated the question before him to be as follows :  " The precise question in this case is, whether an owner who, by such an artificial arrangenent of the material properties of his estate, has added to the advantages and enhanced the value of one portion, can, after selling that portion with those advantages openly and visibly attached, voluntarily break up the arrangement, and thus destroy or materially diminish the value of the portion sold."

But I am not left to mere inference as to whether the proposition so broadly stated in favor of general reciprocity was *obiter* or not, for in the later case of *Butterworth* agt. *Crawford* (46 *N. Y. R.*, 349), in which it was sought to enforce that very doctrine under circumstances which brought it directly before the court, the decision of the case was carefully placed upon a different point, and the court expressly announced that it did not propose to decide the question.

I am, therefore, at liberty to consider the question now before me as one which is open in this state, and which must be dealt with upon principle rather than upon authority.

In the examination of the doctrine as stated, in both its aspects, by judge SELDEN, in *Lampman* agt. *Milks*, with a view of disposing of it upon principle, the first point which challenges attention is, that the two converse propositions are very unequally supported.  So far as it implies an easement in favor of the grantee, it stands upon solid ground, viz. : that no man can derogate from his own grant, and that justice requires that the grant should be construed against the grantor, so far as to pass the privilege affixed by himself to

the property conveyed. So far as it implies an easement in favor of the grantor, these reasons fail, and others must be resorted to. But I cannot see what others there can be, except strict necessity.

True, *Gale & Whately on Easements*, claim that the maxim that no man can derogate from his own grant, though insufficient to account for, is, nevertheless, consistent with the principle that the obligation is imposed equally on the grantee and grantor. But the value of their statement as an authority must, of course, depend upon, and be measured by, the number and the weight of the cases which support it.

The numerous cases cited, in which the dominant tenement was first conveyed, and the implication enforced in favor of the grantee, and all cases in which the conveyance of both dominant and servient tenements was simultaneous, or the title to both vested simultaneously by operation of law, as, for instance, by descent cast, may, therefore, be at once dismissed.

This leaves for special consideration *Nicholas* agt. *Chamberlain* (*Cro. Jac.*, 121), *Pyer* agt. *Carter* (1 *Hurlstone & Norman*, 916), *Davies* agt. *Sear* (7 *Law Rep.*, [*Eq. Cas.*], 427), *Suffield* agt. *Brown* (9 *Jur.* [*N. S.*], 999), and *Hazard* agt. *Robinson* (3 *Mason*, 272).

In *Nicholas* agt. *Chamberlain*, it was held, upon demurrer, "that if one erect a house, and build a conduit thereto, in another part of his land, and convey water by pipes to the house, and afterwards sell the house with the appurtenances, excepting the land, or sell the land to another, reserving to himself the house, the conduits and pipes pass with the house, because *it is necessary and quasi appendant* thereto; and he shall have liberty by law to dig in the land for amending the pipes, or making them new, as the case may require."

*Davies* agt. *Sear* was a case of way *by necessity*. The house conveyed contained an arch, through which a paved passageway ran to land and a stable in the rear. The case turned not only on the state and condition of the property,

but also the notice which the defendant had at the time of the purchase, and it was held that though the archway to which he took subject, may not then have been a way of necessity, yet being obviously designed to be one, and bound to become one, and actually becoming one on the completion of a plan for the erection of other buildings in the immediate vicinity, and then in process of erection, a right of way was reserved by implication.

*Hazard* agt. *Robinson* was a case of water-courses, where a right had also survived from a prior user.

In *Pyer* agt. *Carter*, the defendant's house adjoined that of the plaintiff, and the action was for stopping a drain running under both houses. The two houses had formerly been one, and were converted into two by a former owner, who conveyed one to the defendant and afterwards the other to the plaintiff. At the time of the conveyances the drain existed and was in use for both houses, running first under that of the plaintiff, next under that of the defendant, and then discharging itself into the common sewer. It was proved that the plaintiff might have a drain direct from his house into the common sewer, and it was not proved that the defendant, at the time of his purchase, knew of the position of the drain. It was laid down by the court that where the owner of two or more adjoining houses conveys one to a purchaser, such purchaser will be entitled to all the benefit of all the drains from the house, and subject to all the drains "*necessarily used*" for the enjoyment of the adjoining house, and that, too, without any express reservation or grant, inasmuch as the purchaser takes the house "as it is," and that the question as to what is necessarily used depends upon the state of things at the time of the conveyance, and as matters then stood, without alteration. WATSON, B., said: "We think that the amount to be expended in the alteration of the drainage, or in the constructing of a new system of drainage, is not to be taken into consideration, for the meaning of the word 'necessity,' in the cases above cited, and in *Pinnington* agt. *Galland*

Outerbridge and Scott agt. Phelps.

(9 *Exch.*, 1), is to be understood the necessity at the time of the conveyance, and as matters then stood without alteration, &c., &c."

This case has been much discussed and criticised, and in *Washburn on Easements* (2d ed., *p.* 68), the learned author, after reviewing the cases on this subject states that he considers the doctrine of *Pyer* agt. *Carter*, confined to cases where a drain is necessary to both houses, and the owner makes a common drain for both, and this arrangement is apparent and obvious to an observer. In *Butterworth* agt. *Crawford* (46 *N. Y.*, 349), RAPALLO, J., in delivering the unanimous opinion of the court of appeals, approves of the conclusion reached by professor Washburn and adds: "If *Pyer* agt. *Carter* goes further than that, or at all events, if it applies to cases where there is no apparent mark or sign of the drain, it is not in accordance with the current of the authorities."

In *Suffield* agt. *Brown* (9 *Jur.* [*N. S.*], 999), the owner of a dock adjoining a wharf, claimed as an easement that the bowsprits of vessels in the dock might project over the wharf. The master of the rolls had granted an injunction on the ground that the wharf and the dock had been once owned, and so used together, by the common grantor of both parties.

But lord chancellor WESTERBURY in 1864 (10 *Jur.* [*N. S.*], 111), reversed the decree declaring the law on this branch of the case in the following language :

" Assuming that the vendor had been in the habit, during his joint occupation of both properties, of making the coal wharf subservient in any way to the purposes of the dock, one would suppose that the right to do so was cut off and released by the necessary operation of an unqualified sale and conveyance of the subservient property. It seems to be more reasonable and just to hold that if the grantor intends to reserve any right over the property granted, it is his duty to reserve it expressly in the grant, rather than to limit and cut

down the operation of a plain grant (which is not pretended to be otherwise than in conformity with the contract between the parties) by the fiction of an implied reservation."

In the course of his opinion the learned lord chancellor declares that *Pyer* agt. *Carter* is not good law so far as it seems to establish an implied reservation against a man's own grant, and he also repudiates the doctrine asserted by Gale & Whately, viz.: that the obligation is imposed equally on the grantee and the grantor, and that it is immaterial which of the two tenements is first granted, whether it be the quasi-dominant or quasi-servient tenement, in the following language : " But I cannot agree that the grantor can derogate from his own absolute grant, so as to claim rights over the thing granted, even if they were at the time of the grant continuous and apparent easements enjoyed by an adjoining tenement which remains the property of the grantor."

Thus *Suffield* agt. *Brown*, as finally decided by the lord chancellor, is in perfect harmony with *Burr* agt. *Mills* (41 *Wend.*, 292), already referred to and consistent with the point actually decided in *Lampman* agt. *Milks* (21 *N. Y.*, 505) ; and although subsequently, in *Davies* agt. *Sear* (7 *L. Rep.* [*Eq. Cas.*], 427), the same master of the rolls (lord ROMILLY) who had originally granted the injunction in *Suffield* agt. *Brown*, repeated the assertion that it is immaterial whether the dominant or the servient tenement is conveyed first ; it is evident that his assertions cannot override the direct decision of the lord chancellor, his superior, which remains unreversed. Besides, as already shown, *Davies* agt. *Sear* went upon the question of the way being a way of necessity.

The next point to be considered is, that all easements and servitudes do not stand upon the same footing.

In *Lampman* agt. *Milks* (*supra*), SELDEN, J., says : " It is not every species of easement which passes, as a matter of course, by the conveyance of one of two tenements, or part of a single tenement, by the owner of both or the whole. Easements or servitudes are divided by the civil code of

Outerbridge and Scott agt. Phelps.

France into continuous and discontinuous. Continuous are defined to be those of which the enjoyment is, or may be, continual, without the necessity of any actual interference by man, as a water spout, or right to light or air. Discontinuous are those, the enjoyment of which can be had only by the interference of man, as rights of way, or a right to draw water.

" Servitudes are also divided by the same code into ' apparent ' and ' non-apparent.' The analogy between the common law and the French code, in this respect, would seem to indicate, as suggested by Messrs. Gale & Whately, a common origin. The substance of those divisions may be distinctly traced in the common law cases; and it will be found that those easements, which, according to this classification, are termed *discontinuous*, pass upon a severance of tenements by the owner only when they are *absolutely necessary* to the enjoyment of the property conveyed. Gale & Whately, after stating the grounds upon which easements are held to pass in such cases, say: ' This reasoning applies to those easements only which are attended by some alteration, which is, in its nature, *obvious and permanent;* or, in technical language, to those easements only which are apparent and continuous; understanding, by apparent signs, not those which must *necessarily* be seen, but those which may be seen or known, on a careful inspection by a person ordinarily conversant with the subject.' " (*Gale & Whately on Easements*, p. 40.)

Of course, a right of way may, in an exceptional case, especially if indicated by an artificial structure of a permanent character, constitute an apparent and continuous easement. But, as a general rule, rights of way are in their nature discontinuous and non-apparent, unless strictly and obviously necessary, and the distinction between rights of way and other easements which, from their nature, may be deemed necessary is therefore recognized by many cases, including *Lampman* agt. *Milks*.

For these reasons, and the further one that a right of way

arises only from the effect of the grant or reservation of the land itself, provided there is no other way of access to the same, it has always been held, and the law seems to be now settled beyond controversy, that, in the language of the court in *McDonald* agt. *Lindall* : " The right of way from necessity over the land of another is always of *strict necessity*, and this necessity must not be created by the party claiming the right of way. It never exists where a man can get to his property through his own land. That the way through his own land is too steep or too narrow does not alter the case. It is only where there is no way through his own land that the right of way over another can exist. That a person claiming a way of necessity has already one way, is a good plea and bars the plaintiff " (*McDonald* agt. *Lindall*, 3 *Rawle*, 492; *Stuyvesant* agt. *Woodruff*, 1 *Zabriskie*, 113 ; *Filters* agt. *Humphreys*, 3 *C. E. Green*, 260). Or, as stated by another class of cases, a right of way exists only where the person claiming it has no other means of passing from his estate into the public street or road (*Gayetty* agt. *Bethune*, 14 *Mass.*, 49 ; *Grant* agt. *Chase*, 17 *Mass.*, 443 ; *Smyles* agt. *Hastings*, 22 *N. Y.*, 217 ; *Collins* agt. *Prentice*, 15 *Conn.*, 39 ; *Hyde* agt. *Jamaica*, 27 *Vt.*, 443).

Nor would the rights of a grantor be any more extensive or different, though by the terms of his deed he reserved to himself "a way of necessity." *Viall* agt. *Carpenter* (14 *Gray*, 126), *and Washburn on Easements*, shows by quite an array of authorities, that the right of way of necessity is so limited in respect to its duration, that though it remains appurtenant to the land in favor of which it is raised, so long as the owner thereof has no other mode of access, yet, the moment the owner of such a way acquires, by purchase of other land or otherwise, a way of access from a highway over his own land to the land to which the way belongs, the way of necessity is at an end ; or, in other words, a way of necessity ceases as soon as the necessity ceases.

From the examination so far made, which includes many

cases which I do not deem it necessary to mention specifically, I am satisfied that the true rule of law is as follows: Where the owner of two or more tenements sells one of them, or the owner of an entire estate sells a portion, the purchaser takes the tenement or portion sold, with all the benefits which appear at the time of the sale to belong to it, as between it and the property which the vendor retains. But no burden or servitude can be imposed by the vendor upon the tenement or portion sold, in favor of the property retained by him in derogation of his grant, without a reservation expressed in the grant, unless an apparent sign of servitude exists on the part of the tenement or portion sold in favor of the property retained, and the easement claimed is strictly necessary to the enjoyment of the property retained. In the latter case, visibility and strict necessity must both concur, as in the case of a party wall, and especially in the case of a claim of right of way.

The rule being as stated, the plaintiffs cannot succeed upon this motion. Not only was there no reservation, but it also clearly appears, and on their own showing, that access can be had to the buildings retained by Spofford, and through them to their offices from Morris street; and also that at a comparatively small expense additional, direct and perfectly abundant communication between said street and their offices can be established, by the construction of an interior staircase from the ground floor to the second floor of the building in which the said offices are situated. In view of these facts, the right of way claimed did not spring into life upon the severance of Spofford's property in favor of the property retained by him, and the plaintiffs can claim no such right.

The element of necessity being wanting it is not enough that, as claimed by the plaintiffs, apparent signs of servitude existed at the time of the execution of the Albert and Hickman mortgage. Nor is it necessary to determine whether such signs as did exist really constituted apparent signs of servitude within the rule laid down by the authorities, or were

just as insufficient to create an apparent easement as the gate was held to be in *Stuyvesant* agt. *Woodruff* (1 *Zabriskie*, 133), or the carriageway in *Pheysey* agt. *Vicary* (16 *M. & W.*, 484), or the alleyway in *Felters* agt. *Humphreys* (3 *C. E. Green* [*N. J.*], 260).

The right claimed to affix and maintain signs upon the Broadway front of defendant's building, if not still more inde·fensible, stands upon the same footing as the right of way claimed, even when considered as an independent right and not merely as one which is incidental as a guide to an existing right of way. If it survived a severance it would, as tenants would move into or out of the buildings retained by Spofford, necessitate a periodical putting up and taking down of signs of various forms, sizes and appearances, and, consequently, involve often-recurring changes in the appearance of the front itself. This the law would permit, even in case of a general reservation, only upon proof that the burden upon the servient estate was not increased thereby beyond the extent reserved; and in the absence of a reservation it can be sustained only upon proof of strict necessity as well as visibility. But I cannot see how, in a case like the present, it can be said that the existence of the right claimed is necessary to the enjoyment of the demised premises. The plaintiffs' tenement is bounded by its four walls, and though for the transaction of their business therein it may be more advantageous, or even necessary, that the premises occupied by them should appear to be Broadway property, yet such a requirement on the part of their business does not, in any legal or proper sense, constitute a necessity for the proper enjoyment of the premises. Matters necessary for the proper enjoyment of demised premises, and matters necessary for the profitable transaction of a certain business therein, are altogether different things. Between landlord and tenant no contract or warranty on the part of the landlord that the premises demised shall be or continue fit for the tenant's business, is ever implied from the mere fact of letting. None can, therefore, be implied against

Spofford from the mere fact that he rented to the plaintiffs the offices occupied by them.    How, then, can such an implication arise against the defendant whose position is still stronger? If the plaintiffs stand so much in need of premises fit for the purposes of business usually transacted on Broadway, they should be left to secure them directly.

Upon the whole case, therefore, it clearly appears that the plaintiffs, as tenants whose rights are in all respects subsequent and subject to those acquired by the defendant under the sale of foreclosure, possess no right of easement, or any other right, sufficient to maintain the action against the defendant, and that if Spofford expressly contracted but failed to give them any such right, their remedy is against Spofford, personally.    Having reached that conclusion, in the course of the examination already made, it is unnecessary to consider the further point pressed and argued with great ability on the part of the defendant, that the question involved in this motion is *res adjudicata* between the parties by reason of the decision of the supreme court by which the defendant was compelled to complete his purchase.

The motion of the plaintiffs for the continuance of the injunction should be denied and the preliminary injunction dissolved, with ten dollars costs.